Constantin Petrov Graf von Spee,　　:
et al.,　　　　　　　　　　　　　　　　:
　　　Plaintiffs,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:　　No. 3:05cv1488 (JBA)
v.　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
Wilhelm Graf von Spee, et al.,　　:
　　　Defendants.　　　　　　　　　　:


**RULING ON DEFENDANTS' MOTION TO DISMISS [DOC. # 52]
AND RELATED MOTIONS**

On September 22, 2005, plaintiff Felicia S. Petrov (also
known as "Felicitas Petrov Grafin von Spee," and hereinafter
("Felicia") and her sons and co-conservators, Constantin Petrov
Graf von Spee ("Constantin") and Vladimir Mittrowsky Petrov Graf
von Spee ("Vladimir"), commenced this diversity action.  The
eleven defendants include plaintiff Felicia's brother, nephew,
nephew's wife, and cousin's adopted son — Dr. Maximilian Graf von
Spee ("Maximilian"), Wilhelm Graf von Spee ("Wilhelm II"),
Lorraine Graf von Spee ("Lorraine"), and Clemens Maria Huburtus
Apollinaris Hermann Joseph Graf von Spee ("Clemens"),
respectively (collectively the "von Spee Defendants") — as well
as one individual and six businesses that manage the apparently
vast assets[1] of the Mittrowsky and von Spee families (who were of

---

[1] Plaintiffs allege that "the von Spee Family Fortune" is
"in excess of hundreds of millions of dollars," and possibly "in
excess of a billion dollars, and quite likely multiples of same."
(Compl. [Doc. # 1] at 12-14.)  The families have held some of

German and Czechoslovakian nobility), namely Dr. Bernhard Richter ("Richter"), Graeflich von Spee'sche Zentralverwaltung, the von Spee Family Enterprise, Almo Holding Company, Inc., two businesses named Almo-Farm-Anstalt Ltd. (Illinois and Delaware corporations), and Almo Farms. (Compl. at 7-13, 16-25.) The fourteen-count complaint alleges breach of fiduciary duties, conversion, fraudulent concealment, continuing conspiracy, fraud, and criminal conduct, and seeks an accounting, equitable relief, and punitive damages.[2] (Id. at 65-78; see also Am. Compl. [Doc. # 50]).

## I. Introduction

On December 11, 2006, all defendants filed a Motion to Dismiss with memoranda, multiple affidavits, and exhibits in support [Docs. # 52-59, 62],[3] under the doctrine of forum non

_____

these assets since 1846. (Id. at 29-51.)

[2] On October 31, 2006, plaintiffs filed an Amended Complaint with multiple attachments in which they added one more count. Plaintiffs have sought a jury trial [Doc. # 51]; defendants do not concede that plaintiffs have such a right. (Def. Mem. in Supp. at 14 n.12.)

[3] Defendants filed affidavits from the following six people: Attorney Jennifer L. Marlborough [Doc. # 53], to which were attached a copy of plaintiffs' First Amended Complaint (Ex. A) and chart of von Spee family from mid-19th century to the current day (Ex. B); defendant Dr. Richter [Doc. # 54], to which were attached a copy of the Articles of Merger of Almo (Illinois) Ltd. (Ex. A) and printout from Illinois Secretary of State regarding the absence of an Illinois corporation with the name Almo Farms (Ex. B); defendant Dr. Maximilian Graf von Spee [Doc. # 55], to which was attached a copy of an Agreement, dated September 9, 2003, between plaintiffs Constantin Petrov and Vladimir Petrov

<u>conveniens</u>, as the more appropriate forum is in Germany (Def. Mem. in Supp. [Doc. # 59] at 14-33), and under the doctrine of international comity, in that plaintiffs have commenced multiple legal proceedings in Germany, in which German courts already have ruled on many of the claims at issue here (<u>Id.</u> at 15, 34-35).[4]

---

and defendant Dr. Maximilian Graf von Spee (Ex. A); defendant Wilhelm Graf von Spee [Doc. # 56]; defendant Lorraine Gräfin von Spee [Doc. # 57]; defendant Clemens Graf von Spee [Doc. # 57], with a copy of the signed affidavit in German attached; and Attorney Horst Müller-Langguth [Doc. # 62]. Twelve exhibits were attached to this final affidavit: January 19, 2004 decision of the District Court in Brilon, with English translation (Ex. A); February 6, 2004 affirmance by the Higher District Court in Arnsberg, with English translation (Ex. B); March 8, 2005 decision by the District Court in Duisburg, with English translation (Ex. C); April 21, 2005 dismissal of plaintiff Felicia Petrov's appeal by District Court in Duisberg, with English translation (Ex. D); May 24, 2005 dismissal of plaintiff's Felicia Petrov's appeal by German Higher District Court in Duisburg, with English translation (Ex. E); October 25, 2005 decision by Düsseldorf Court of Appeals, with English translation (Ex. F); November 22, 2005 affirmance of ruling, with English translation (Ex. G); April 20, 2006 application for financial aid with the Higher District Court in Düsseldorf by plaintiff Felicia von Spee, with English translation (Ex. H); August 7, 2006 denial of application by Higher District Court, with English translation (Ex. I); October 3, 2006 affirmance by Higher District Court, with English translation (Ex. J); June 22, 2006 decision by District Court in Bonn, without English translation (Ex. K); and selected provisions of German Code of Civil Procedure, in English (Ex. L).

[4] Defendants also argue that four of the defendants are "non-existent" (<u>id.</u> at 35-36) and two "are only assets" of some of the individual defendants (<u>id.</u> at 36-37). Lastly, defendants argue that even if the Amended Complaint is not dismissed in its entirety, then at least the Thirteenth Count should be dismissed as there is no private right of action for those claims. (<u>Id.</u> at 37-39.)

Defendants have preserved for a later time their argument that this Court lacks <u>in personam</u> jurisdiction over them. (Def. Mem. in Supp. at 3 n.2.)

Thereafter, the parties conducted discovery relating to the
pending Motion to Dismiss. [See Docs. # 42-46, 65-67, 69-76, 79-
91, 93-95, 97-108, 110-13, 115.]⁵  After several motions for
extension of time were granted [Docs. # 81, 86-88, 95, 100], on
August 2, 2007 plaintiffs filed their brief in opposition, with
affidavits and exhibits in support [Docs. # 116-126, 129,
133-34].⁶  Twenty-two days later, defendants filed their reply

---

⁵ On February 15, 2007, this file was referred to Magistrate
Judge Joan Glazer Margolis for resolution of all discovery
disputes [Doc. # 77].  Familiarity with Magistrate Judge's Ruling
on Defendants' Motion for Protective Order ("March Ruling"),
filed March 27, 2007 [Docs. # 93-94], and with this Court's
subsequent Ruling on Plaintiff's Motion to Compel and Clarify the
March Ruling, filed May 17, 2006 [Doc. # 112] is presumed.
    Pursuant to these rulings, plaintiffs' depositions of the
individual defendants were scheduled at the U.S. Consulate in
Düsseldorf, Germany, starting on May 21, 2007 and continuing
through the week; that day, while defense counsel was already in
Germany, plaintiffs' counsel informed defense counsel that he had
decided to forego the depositions because the discovery rulings
were too restrictive.  Counsel held settlement discussions
instead on May 22 and 23, 2007. (Status Report [Doc. # 113] at 1-
5; Pl. Mem. Concerning Deps. [Doc. # 115] at 4-7; Morin Aff.
[Doc. # 137] ¶¶ 7-9.)

⁶ The following thirteen exhibits are attached: affidavit of
Attorney J. Paul Johnson (Ex. A); affidavit of Attorney Werner U.
Martens (Ex. B); affidavit of Attorney Wolfgang Hering (Ex. C;
see also Notice of Errata [Doc. # 120]), with copy of order by
the Alaska Superior Court attached; affidavit of Attorney Hans
Scharpf, with copy of Hering Aff. attached (Ex. D); affidavit of
plaintiff Constantin Petrov, with letter in German to defendant
Dr. Maximilian Graf von Spee and envelope attached (Ex. E);
affidavit of plaintiff Vladimir Petrov (Ex. F); affidavit of
Walter Stewart (Ex. G); affidavit of Niles Allen McKee (Ex. H);
affidavit of Attorney Philip Paul Weidner (Ex. I); copy of
Scheduling Order, filed September 7, 2006, Endorsement Order,
dated October 13, 2006, Endorsement Order, dated January 5, 2007,
and Electronic Order, filed April 23, 2007 (Ex. L); and affidavit
of Attorney Lisa Rosano (Ex. M), with Notice of Articles and

4

brief with affidavits and exhibits in support [Docs. # 135-37].[7]

On September 14, 2007, plaintiffs filed their Motion for Leave to

File Surreply Memorandum [Doc. # 140][8] and Motion for Expedited

_____

Transition Application for Erie Creek Forest Reserve Ltd., Notice
of Articles and Annuual Report for Almforest Timber Co. Ltd.,
Notice of Articles for Texada Island Forest Reserve Ltd., letters
to, faxes to, and check to, letters from, check from, e-mail
from, business cards of, and Five Year Management Plan of Almo
Tree Plantation Ltd.
    Two exhibits were filed under seal [Doc. # 134]: the medical
records of defendant Dr. Maximilian Graf von Spee (Ex. J)
plaintiff Felicia Petrov (Ex. K) [Docs. # 123-135].

    [7] Attached to defendants' reply brief [Doc. # 135] was a
copy of a letter from defense counsel to plaintiffs' counsel,
dated June 26, 2007, to which was attached a one-page list of
cases as well as a copy of a decision from the Southern District
of New York, filed May 30, 2007.
    The following six exhibits were attached to the Supplemental
Affidavit of Horst Müller-Langguth [Doc. # 136]: December 7, 2006
decision of the Higher District Court of Bonn, with English
translation (Ex. A); April 19, 2007 decision of the Court of
Appeals of Cologne, with English translation (Ex. B); August 3,
2007 decision of the Higher District Court Bonn, with English
translation (Ex. C); June 18, 2007 decision of Court of Appeals
Düsseldorf, with English translation (Ex. D); excerpts of letter
from Attorney Hans Scharpf to Higher District Court in Bonn,
dated June 29, 2007, with English translation (Ex. E); and
excerpts from website of Foris AG, in German (Ex. F).
    The following five exhibits were attached to the Affidavit
of Attorney John T. Morin [Doc. # 137]: Background Information on
Constantin P. Paton, the Senior Partner of European-American
Investment Associates (Ex. A); copies of correspondence between
the parties, some with English translations (Ex. B); translation
of excerpts of legislative history regarding a bill pending
before the legislature of North-Rhine Westphalia deliberating the
repeal of the Land Reform Act of May 22, 1962 (Ex. C); copy of
article on German law in www.findlaw.com (Ex. D); and copy of
letter from plaintiffs' counsel to defense counsel, dated
February 8, 2007 (Ex. E).

    [8] The following three exhibits were attached: sixty-five
pages, including copies of correspondence between counsel, e-mail
communications between counsel, correspondence with and memoranda

Consideration [Doc. # 141].

For the reasons stated below, defendants' Motion to Dismiss is granted, plaintiffs' Motion for Hearing [Doc. #118] is denied as moot, plaintiffs' Motion for Leave to File Surreply Brief [Doc. # 140] is granted,[9] and plaintiffs' Motion for Expedited Consideration [Doc. # 141) is granted.

## II. Factual Background[10]

The history giving rise to this lawsuit begins on March 31, 1846, when August Wilhelm Graf von Spee, the great-grandfather of

---

of Sunrise Assisted Living of Stamford, correspondence between the parties, e-mail correspondence between the parties, and another copy of the agreement between the parties (Ex. A); another affidavit from Attorney Wolfgang Hering (Ex. B); and affidavit from defense counsel (Ex. C).

[9] On September 17, 2007, defendants filed their brief in opposition to this motion [Doc. # 142], in which they accurately argue that defendants' surreply brief is untimely and that as a general rule, this district does not permit surreply briefs. (Id. at 3-4 & n.4). See Deray v. Larson, No. 3:02 CV 2139 (JCH), 2004 WL 2211939, at *4 (D. Conn. Sept. 29, 2004) ("[S]ur-replies are not permitted under the Local Rules of the District of Connecticut."); Marczeski v. Law, 122 F. Supp. 2d 315, 317 n.2 (D. Conn. 2000) (surreply briefs may be filed only with leave of court). Not surprisingly, given the nature of this litigation, additional briefs on this issue were filed by both sides on September 18, 2007 [Docs. # 143-45]. For the sake of completeness, however plaintiffs' motion is granted.

[10] The lengthy factual background was derived from several filings. (See Richter Decl. ¶¶ 3-4, 6-8, 11-13, 16-25, Exs. A-B; Maximilian Decl. ¶¶ 3-6, 8, 13, 14-15; Wilhelm Decl. ¶¶ 3-5, 7-10, 13-14, 16; Lorraine Decl. ¶¶ 3-5, 7-8; Clemens Decl. ¶¶ 3-9, 12-13; Def. Mem. in Supp. at 3-13; Müller-Langguth Decl. ¶¶ 6-61, Exs. A-J; Pl. Mem. in Opp., Ex. E ¶¶ 4-8, 11-12, 17, Ex. F ¶¶ 5-6, Ex. J; Def. Reply at 6-12; Supp. Müller-Langguth Decl. [Doc. # 136] ¶¶ 7-25, Exs. A-D; Morin Aff. ¶¶ 23-34, 36, Ex. A; Pl. Surreply, Ex. A.)

Felicia and Maximilian,[11] founded the "Fideikommiss" estate of the "Counts von Spee," consisting of land, forests, and other real estate in Heltorf (formerly Prussia, and now the German State of North-Rhine Westphalia). The estate was called the "Fideikommiss" estate, akin to an estate held in trust or in "fee tail," so that is could not be sold, devised by will, or otherwise transferred except through the estate of the deceased owner to his oldest son, in a form of primogeniture. On August 28, 1846, the King of Prussia authorized the founding of the von Spee Fideikommiss in Heltorf. Upon the death of August Wilhelm Graf von Spee in 1882, his oldest son, Franz Graf von Spee ("Franz") became the owner of the von Spee Fideikommiss in Heltorf; in that Franz had no children, upon his death in 1921, his younger half brother, Wilhelm Graf von Spee ("Wilhelm") would have become the owner, but he waived his rights. The next-in-succession would have been August Graf von Spee ("August"), Wilhelm's oldest son and father of Felicia and Maximilian, but he also waived his rights to the Fideikommiss estate in Heltorf by a notarized declaration on December 2, 1909, which declaration was registered, and again in declarations on July 30, 1920, January 10 and 13, 1921, and February 14, 1921. As a result, the Fideikommiss estate passed to Wilhelm's younger brother,

_____

[11] A complete, and helpful, family tree, starting with August Wilhelm Graf von Spee (1813-82) is found at the Marlborough Affidavit, Ex. B.

Wilderich Graf von Spee ("Wilderich"), uncle of Felicia and Maximilian.  On January 2, 1922, August instead received a substantial Fideikommiss estate in Eastern Europe, specifically South Moravia, named the Josolovitz estate.  On March 31, 1921, the Court of Appeals in Düsseldorf issued a Certificate under which Wilderich was confirmed as the owner of the Fideikommiss estate in Heltorf.

In accordance with Germany's Fideikommiss Dissolution Law of July 6, 1938 ("FDL"), in 1939, the institution of the Fideikommiss estate was abolished and Wilderich became the sole owner of the property, without any restrictions upon its transfer. Due to the interruption by World War II, certificates of dissolution of some Fideikommiss estates were not issued for many years, so that Wilderich did not receive his "Fideikommiss Dissolution Certificate" from the "Family Trust Panel" of the Court of Appeals in Düsseldorf until November 27, 1952.

Immediately following World War II, Germany was divided into four occupation zones, with the property at issue here being located in the Rhineland and Westphalia, both of which were occupied by Great Britain.  Anticipating that the British would expropriate large parcels of land, on June 19, 1947, with the assistance of counsel, Wilderich provisionally transferred certain parcels of land to his brother August, which transfers were approved by the Family Trust Panel of the Court of Appeals

in Düsseldorf; similar provisional transfers were also made to
August's wife, Maria Gräfin von Spee ("Maria"), mother of Felicia
and Maximilian.[12]  Wilderich's son, also named Wilhelm Graf von
Spee, did not survive the war; because Felicia had moved to the
United States, Wilderich chose Maximilian, his nephew (son of his
youngest brother August), to be the heir of his estate.  On
October 2, 1961, when the fear of expropriation no longer
existed,[13] again with the assistance of attorneys, Wilderich,
August, Maria, and Maximilian entered into an agreement revoking
the provisional transfers in 1946-47, and transferring the land
to Maximilian, who had been designated to succeed Wilderich as
manager of the von Spee properties.  August died on October 7,
1961.[14]  Wilderich died on April 5, 1967; under his will,
Maximilian, his nephew, became the primary "life tenant" of the

---

[12] On September 4, 1947, the British Military Government
issued a regulation that permitted the newly created state of
North-Rhine Westphalia to expropriate farm and forest property
greater than 150 hectares owned by a single owner; this
regulation was enacted into legislation on May 5, 1949 by the new
State of North-Rhine Westphalia's parliament.  The law did not
apply retroactively, so it did not affect the provisional
transfers made by the von Spee family.  By the time the
expropriation law was repealed in 1962, the new government never
exercised its right to expropriate any land.

[13] See supra note 12.

[14] Although Felicia received a copy of her father's will at
the time of his death, more than forty years later, she and her
sons filed an application in the District Court in Bonn to
determine which of his three wills was the effective one.  That
litigation is discussed infra.

estate at Heltorf, with Maximilian's oldest son, also named
Wilhelm Graf von Spee ("Wilhelm II"), as the remainderman.
Felicia and her other brother, Johannes Graf von Spee, received
nothing under the will.[15]  On June 24, 1986, Wilhelm II
registered as sole owner of the land, shortly after his father
had transferred it to him.

Felicia and her sons have commenced litigation in Germany
contesting the validity of the 1961-62 transfers, with all the
court decisions rejecting their claims and upholding Maximilian's
right to transfer title to his son, Wilhelm II: the District
Court Brilon on January 29, 2004; the Higher District Court
Arnsberg on February 6, 2004; the District Court Duisberg on
March 8, 2005; the District Court Duisberg on April 21, 2005; and
the Higher District Court Duisberg on May 24, 2005.

Plaintiffs also have taken preliminary steps toward
litigation in Germany to challenge the dissolution of the von
Spee Fideikommiss estate in 1939 and the Fideikommiss Dissolution
Certificate issued by the Family Trust Panel of the Court of
Appeals in Düsseldorf in 1952.  These claims were rejected by the
Court of Appeals in Düsseldorf in written decisions on October
25, 2005 and November 22, 2005.

On or about April 20, 2006, plaintiffs took preliminary
steps in commencing litigation to seek an accounting from the

---

[15] This will never has been contested.

various defendants; these claims similarly were rejected by the Higher District Court in Düsseldorf on August 7, 2006, which decision was confirmed on reconsideration on September 18, 2006 and October 30, 2006. Upon Felicia's appeal, the Court of Appeals in Düsseldorf issued a ruling on June 18, 2007 in defendants' favor, although on somewhat different grounds.

In addition, approximately three years ago, plaintiffs filed an application for the issuance of an inheritance certification in the District Court in Bonn with respect to August's will. On June 22, 2006 and again on August 4, 2006, the District Court held preliminarily that Felicia was entitled to one quarter of her father's estate. On defendants' appeal, the Higher District Court in Bonn reversed the lower court on December 7, 2006, which decision was affirmed by the Court of Appeals in Cologne on April 19, 2007, remanding the case. On August 3, 2007, the Higher District Court in Bonn held that Maximilian was August's sole heir.

Plaintiffs Felicia and Constantin reside in Connecticut; plaintiff Vladimir lives in Alaska. Felicia, who was born in 1923, is in poor health, including suffering from Alzheimer's disease, and resides in a nursing home. Constantin and his wife are actively involved in managing her care, which is costly.[16]

_____

[16] On September 9, 2003, Maximilian entered into a written agreement with Constantin and Vladimir to provide up to $18,000 per month toward the cost of his sister's nursing care; at some

Constantin and Vladimir have "a working knowledge" of German and would need a translator to interpret for them in complex matters.

Defendants Maximilian and Wilhelm II are citizens and residents of Germany, and only travel to the U.S. to visit Felicia.[17]  Defendant Lorraine Gräfin von Spee ("Lorraine"), the wife of Wilhelm II, is a citizen of Austria and a resident of Germany; similarly, she only visits the U.S. to see Felicia. Richter, a citizen and resident of Germany, is an employee of Wilhelm, working at the Düsseldorf office of defendant "Gräflich von Spee'sche Zentralverwalthung."  He is the President and sole director of defendants Almo Holding Company, Inc. and Almo-Farm Anstalt Ltd., both Illinois corporations.  He has been to Connecticut only once to visit Felicia.  Defendant Clemens Graf von Spee ("Clemens") is Maximilian's cousin; he is a citizen and resident of Germany and has never traveled to Connecticut.  Of the individual defendants, only Richter, Wilhelm II and Lorraine are fluent in English, with the rest needing interpreters.

III.  Discussion

As previously indicated, defendants argue that the case

_____

point, he reduced the monthly payments to $6,000.  (Maximilian Decl. ¶¶ 11-12, Ex. A; Pl. Mem. in Opp., Ex. E ¶¶ 9-10, Ex. F ¶ 7, Ex. K; Pl. Surreply at 19 n.8, 26-27 & n.11, Ex. A).

[17] Maximilian, who was born in 1928, also is in declining physical and mental health.  (See Status Report [Doc. # 113] at 4; Pl. Mem. Concerning Deps. at 4-5 & n.2; Pl. Mem. in Opp. at 63 n.32, Ex. J; Pl. Surreply at 16 n.6, 20 n.9, 22-23.)

should be dismissed under the doctrine of forum non conveniens, as the more appropriate forum is in Germany. They argue that under the well-established standards of Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981) and Gulf Oil Corp. v. Gilbert, 330 U.S. 501 (1947), Germany is an available and adequate alternative forum, defendants are subject to service of process in Germany, Germany permits litigation of the subject matter in dispute, there has been previous and current litigation in Germany over the past three years so that Germany is an adequate forum and provides adequate remedies for this dispute, and an analysis of the private and public interest factors under Gulf Oil (access to sources of proof, compulsory process for unwilling witnesses and convenience for willing witnesses, other practical problems that would adversely affect the trial, administrative burden, local interest in the dispute, relationship of governing law to the forum, and unfairness of burdening citizens with jury duty) mandate that this case be heard in Germany. (Def. Mem. in Supp. at 15-33.) Defendants further argue that the doctrine of international comity dictates that the case should be dismissed from this forum, in that plaintiffs have commenced multiple legal proceedings in Germany, in which German courts already have ruled on many of the claims at issue here.[18] (Id. at 15, 34-35.)

---

[18] As noted supra, defendants also argue that four of the defendants are "non-existent" (id. at 35-36) and two "are only assets" of some of the individual defendants (id. at 36-37).

In their brief in opposition, plaintiffs argue that their choice of forum is entitled to considerable deference and must be honored, and the von Spee defendants are incorrect that German courts have resolved any of the issues here in substantive rulings, so that the doctrines of forum non conveniens and international comity do not apply here. (Pl. Mem. in Opp. at 5-20.) With regard to the issue of forum non conveniens, plaintiffs reiterate that "great deference" must be accorded to plaintiffs' choice of forum (particularly given the "sliding scale approach" of the Second Circuit in Iragorri v. United Technologies Corp., 274 F.3d 65 (2d Cir. 2001)), the von Spee defendants have not met their "heavy burden" of disturbing the basic principles regarding forum non conveniens, there is no meaningful access to relief in Germany due to financial barriers and lack of access to required information, and the private and public interest factors all weigh in favor of maintaining this case in Connecticut. (Pl. Mem. in Opp. at 20-87.) Similarly, plaintiffs assert that defendants have not properly raised the doctrine of international comity and the issue is not ripe nor well-taken. (Id. at 87-93.)[19]

_____

Lastly, defendants argue that even if the Amended Complaint is not dismissed in its entirety, then at least the Thirteenth Count should be dismissed as there is no private right of action for those claims. (Id. at 37-39).

[19] Plaintiffs argue that the remaining issues should be addressed by a Motion for Summary Judgment, and not by a Motion

In their reply brief, defendants have summarized the various German court decisions, and repeat that under the guidelines of Gulf Oil and Iragorri and the doctrine of international comity, the case should be dismissed.[20]  (Def. Reply at 15-54.)  In their surreply brief, plaintiffs also reviewed the various German proceedings, which they describe as merely "administrative in nature, not adversarial" (Surreply Brief at 4-9), and again contend that under Gulf Oil and Iragorri, this action should remain in Connecticut (id. at 9-39), in that the "basic fraud . . . occurred in the United States," and not in Germany (id. at 11-12), and that the same result is reached under the doctrine of international comity (id. at 39-40).

### A.   Forum non conveniens

The seminal U.S. Supreme Court case on this issue is the Gulf Oil decision, in which a Virginia resident brought suit in the Southern District of New York against a Pennsylvania corporation, qualified to conduct business in both Virginia and New York, arising out of damages sustained by him in Virginia from an explosion at his warehouse.  330 U.S. at 502-03.  In affirming the district court's dismissal of the action under the doctrine of forum non conveniens, the Supreme Court observed that

_____

to Dismiss.  (Id. at 93-94.)

[20] As defendants have observed, plaintiffs offered no response to defendants' other arguments.  (Def. Reply at 54.)

while a plaintiff's choice of forum is to be given considerable
deference, id. at 508, "the open door may admit those who seek
not simply justice but perhaps justice blended with some
harassment. A plaintiff sometimes is under temptation to resort
to a strategy of forcing the trial at a most inconvenient place
for an adversary, even at some inconvenience to himself." Id. at
507. The Court then recited the well-known litany of private and
public factors to be balanced in these matters:

> An interest to be considered, and the one likely to be
> most pressed, is the private interest of the litigant.
> Important considerations are the relative ease of
> access to sources of proof; availability of compulsory
> process for attendance of unwilling, and the cost of
> obtaining attendance of willing, witnesses; possibility
> of view of premises, if view would be appropriate to
> the action; and all other practical problems that make
> trial of a case easy, expeditious and inexpensive.
> There may also be questions as to the enforcibility of
> a judgment if one is obtained. The court will weigh
> relative advantages and obstacles to fair trial. . . .
>
> Factors of public interest also have [a] place in
> applying the doctrine. Administrative difficulties
> follow for courts when litigation is piled up in
> congested centers instead of being handled at its
> origin. Jury duty is a burden that ought not be
> imposed upon the people of a community which has no
> relation to the litigation. . . . There is a local
> interest in having localized controversies decided at
> home. There is an appropriateness, too, in having the
> trial of a diversity case in a forum that is at home
> with the state law that must govern the case, rather
> than having a court in some other forum untangle
> problems in conflict of laws, and in law foreign to
> itself.

Id. at 508-09. The Supreme Court emphasized that while "the
plaintiff's choice of forum should rarely be disturbed," "[i]t is

often said that the plaintiff may not, by choice of an inconvenient forum, 'vex,' 'harass,' or 'oppress' the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy." Id. at 508 (footnote omitted).

The factors in Gulf Oil and its progeny were revisited by the Second Circuit in Iragorri, concerning an elevator accident in Cali, Colombia, in which a Florida domiciliary was killed, leaving behind his widow and children in Florida; two of the three corporate defendants sued had their principal places of business in Connecticut. 274 F.3d at 69-70. As the Second Circuit explained, under Gulf Oil, "a court reviewing a motion to dismiss for forum non conveniens should begin with the assumption that the plaintiff's choice of forum will stand unless the defendant meets the burden," although "[a]t the same time, we are led to understand that this deference is not dispositive and that it may be overcome." Id. at 71. The Second Circuit urged that a "sliding scale" be applied, so that "the degree of deference given to a plaintiff's forum choice varies with the circumstances," in that a "plaintiff's choice of forum is generally entitled to great deference when the plaintiff has sued in the plaintiff's home forum," as opposed to a foreign plaintiff suing in the United States, which is entitled to "less deference." Id. (citations omitted).

The Second Circuit thus imposed the following guidelines:

17

The more it appears that a domestic or foreign
plaintiff's choice of forum has been dictated by
reasons that the law recognizes as valid, the greater
the deference that will be given to the plaintiff's
forum choice.  Stated differently, the greater the
plaintiff's or the lawsuit's bona fide connection to
the United States and to the forum of choice and the
more it appears that considerations of convenience
favor the conduct of the lawsuit in the United States,
the more difficult it will be for the defendant to gain
dismissal for forum non conveniens.

Thus, factors that argue against forum non conveniens
dismissal include the convenience of plaintiff's
residence in relation to the chosen forum, the
availability of witnesses or evidence to the forum
district, the defendant's amenability to suit in the
forum district, the availability of appropriate legal
assistance, and other reasons relating to convenience
or expense.  On the other hand, the more it appears
that the plaintiff's choice of a U.S. forum was
motivated by forum-shopping reasons-such as attempts to
win a tactical advantage resulting from local laws that
favor the plaintiff's case, the habitual generosity of
juries in the United States or in the forum district,
the plaintiff's popularity or the defendant's
unpopularity in the region, or the inconvenience and
expense to the defendant resulting from litigation in
that forum-the less deference the plaintiff's choice
commands and, consequently, the easier it becomes for
the defendant to succeed on a forum non conveniens
motion by showing that convenience would be better
served by litigating in another country's courts.

Id. at 71-72 (footnote omitted and paragraph break added); see

also id. at 73 ("giv[ing] greater deference to a plaintiff's

forum choice to the extent that it was motivated by legitimate

reasons, including the plaintiff's convenience and the ability of

a U.S. resident plaintiff to obtain jurisdiction over the

defendant, and diminishing deference to a plaintiff's forum

choice to the extent that it was motivated by tactical

advantage").

Two of the three plaintiffs — Felicia and Constantin — are
residents of Connecticut, so that under Iragorri, their "choice
of forum is generally entitled to great deference," because they
have brought suit in their "home forum." 274 F.3d at 72-73.
However, as the Second Circuit explained, "this deference is not
dispositive and . . . it may be overcome." Id. at 71. The
private factors in Gulf Oil, which are repeated in Iragorri —
access to sources of proof, availability of compulsory process
for attendance of unwilling and willing witnesses, and all other
practical problems that make for an easy, expeditious and
inexpensive trial — all point in the direction of dismissal. As
discussed extensively by the parties in their briefs (Clemens
Decl. at 26-28; Pl. Mem. in Opp. at 22-23, 57-75; Def. Reply at
34-44; Pl. Surreply at 22-28), all of the key events (from the
mid-nineteenth century to the present) occurred in Germany.
Virtually all of the relevant documents (land records, wills,
powers of attorney, authorizations, etc.) are in Germany, are
written in German (some in an archaic form), and would need to be
translated into English if the case were to be tried here. (See
Maximilan Decl. ¶ 10; Wilhelm Decl. ¶¶ 13-14; Clemens Decl.
¶ 11.)[21] See NCA Holding Corp. v. Norddeustsche Landesbank

---

[21] While plaintiffs are correct that "[m]odern technological
advances have made international travel and communication cheaper
and easier," so that the private interest factors no longer have

<u>Gironzentrale</u>, No. 96 Civ. 9321 (LMM), 1999 WL 39539, at *3

(S.D.N.Y. Jan. 28, 1999).  Plaintiffs complain, however, that the

evidence is not accessible to them in Germany, requiring them to

limit their research to publicly available sources, resulting in

"incomplete" research.  (Pl. Mem. in Opp. at 59-60, Ex. C ¶ 8.a.)

However, as defendants point out, based upon their submissions in

the German lawsuits and this lawsuit, plaintiffs "already have in

their possession volumes of documents related to the German wills

and estate matters and the important land transfers from courts

and public archives in Germany," and, according to defendants,

approximately 1,200,000 pages of documents regarding the von Spee

family, dating backing to the Twelfth Century, are maintained by

the Rhineland Authority for Archives and Museums in Germany, all

in the German language.  (Def. Reply at 34-35.)

The claims here require a detailed examination of German

law, commencing with German property and estate law of the mid-

nineteenth century to pre-World War II period (including the

FDL), German property and estate law immediately following World

War II during the British occupation, and German property and

estate law subsequent to World War II.  While this, no doubt,

would be a fascinating exercise, it is clearly one which can be

---

the same impact as they did when the U.S. Supreme Court decided
<u>Gulf Oil</u> in 1947 (Pl. Mem. in Opp. at 61), involvement in
prolonged litigation in a foreign country is still a difficult
and painstaking task, for whichever side is inconvenienced.

handled more efficiently and effectively in the German court
system than in an American one.  See Bybee v. Oper der Standt
Bonn, 899 F. Supp. 1217, 1223 (S.D.N.Y. 1995) ("The need to apply
foreign law is a factor that weighs in favor of dismissal. . . .
Although this Court is able to apply German law when necessary,
it makes no pretense that it could do so as knowledgeably or as
efficiently as a German tribunal.") (multiple citations omitted).
While plaintiffs are correct that the need to apply foreign law
is not alone sufficient to dismiss a lawsuit under the doctrine
of forum non conveniens (Pl. Mem. in Opp. at 82-84), as stated
above, this lawsuit requires construction of one-and-a-half
centuries of German property and estate law.[22]

---

[22] As previously indicated, the parties dispute whether the
decisions issued by the German courts are judicial, or
administrative, in nature.  Defense counsel appropriately has
observed that when the parties' German attorneys and experts
"cannot agree on the import or nature of the German decisions or
even the substance of such decisions, this is yet another reason
to dismiss the case."  (Def. Reply at 49 (citing Kirch v. Liberty
Media Corp., No. 04 Civ. 667 (NRB), 2006 WL 3247363, at *9
(S.D.N.Y. Nov. 8, 2006) ("[T]he fact that there is considerable
dispute between the experts on both sides as to the preclusive
effect of the prior decision upon this case further weighs in
favor of a German forum.") (citation omitted)).)
    Moreover, plaintiffs further assert that "[g]iven the von
Spee and Mittro[w]sky fortunes in [the] Czech Republic . . . and
the past Communist Regime's seizure and confiscation" of assets
of August and Maria, "Felicia has rights as to property in [the]
Czech Republic" and possibly in Russia.  (Pl. Mem. in Opp. at 58-
59.)  Defendants suspect that plaintiffs may commence new
litigation in Canada, Austria, and Australia.  (Def. Reply at
36.)  To the extent that plaintiffs additionally may seek
reimbursement under Czech, Austrian, and/or Russian law, the
interests of justice would be better served by continuing this
lawsuit in Germany.

Except for the three plaintiffs, any witnesses still alive who can testify as to the underlying facts are in Germany. (See Richter Decl. ¶ 15; Maximilian Decl. ¶ 9; Wilhelm Decl. ¶¶ 13, 15; Clemens Decl. ¶ 10.) Of the individual parties, it appears that four are bilingual — plaintiff Felicia and defendants Richter, Wilhelm II, and Lorraine — although Felicia apparently is in ill health and likely would not testify.[23] Plaintiffs Constantin and Vladimir only have a "working knowledge" of German, and would need a translator if the proceedings were held in Germany, whereas the other German defendants would need a translator if the proceedings were held here. For plaintiff Vladimir, who resides in Alaska most of the year, it is only slightly less convenient to travel to Connecticut than to Germany.[24] As to other non-party German witnesses, it appears that those witnesses can be compelled to testify in German courts, whereas they could not be compelled to travel to Connecticut for their testimony. (Müller-Langguth Decl. ¶¶ 62-70, 81-82.) To be sure, travel to Germany would greatly inconvenience plaintiff Constantin, who, along with his wife,

───────────────

[23] According to plaintiffs, while Felicia is in a "fragile state of health," "she still is a competent and critical witness." (Pl. Surreply at 20 n.9). But see supra note 17.

[24] As plaintiffs explain, there are no direct flights from Alaska to Germany during the winter because planes do not fly over the North Pole then; instead, he likely would have to switch planes on the East Coast. (Pl. Mem. in Opp. at 66, Ex. F ¶ 10.)

tends to his mother's needs.  However, that factor alone is not
sufficient to offset all the other factors strongly pointing
toward dismissal of this action.

Plaintiffs have identified other potential witnesses,
including Constantin's wife and two sons, an individual named Uli
Benniwitz (location not mentioned), an individual named Helga
Kubasch from California (regarding defendants' real estate
transactions ), Dr. Eugene Meyers of Florida (same testimony),
Niles Allen McKee of Georgia (testimony regarding the Almo
Defendants), Walter Stewart of Delaware, Andrew Dill of Florida,
defendants Richter, Lorraine and Clemens, Ranier Münter Anderson,
and "witnesses in New York, Illinois and Florida."  (Pl. Mem. in
Opp. at 27, 62-64, Exs. G-H, Ex. I ¶¶ 13-14, 19-26, Ex. M; see
also Pl. Surreply at 22-23.)  However, as noted by defendants,
none of these witnesses appear to have any bearing upon the key
issues in this litigation.  (Def. Reply at 36-38.)

Similarly, the public factors in Gulf Oil — administrative
burden, local interest in dispute, relationship of governing law
to the forum, and unfairness of burdening citizens with jury duty
— all gravitate toward dismissal.  As discussed extensively by
the parties in their briefs (Def. Mem. in Supp. at 28-31; Pl.
Mem. in Opp. at 82-84; Def. Reply at 44-50; Pl. Surreply at 28-
29, 37-39) and in the preceding paragraphs, a German trier of
fact is far more likely to be conversant with the German property

and estate law, particularly of the two prior centuries, than a judge or jury in Connecticut; the documentation and testimony (much of which would be technical in nature) would not call for translations in Germany, as would be the case in litigation tried here.  Other than Felicia's and Constantin's presence in Connecticut, there is no local interest in this matter, even taking into account the fiduciary obligations of Felicia's two sons, who serve as her co-conservators, and the interests of U.S. and Connecticut "taxing authorities."[25]  (Pl. Mem. in Opp. at 3-5, 8, 12-13, 29, 50-51, 77-79, Ex. A ¶¶ 4-6; Pl. Surreply at 18-19, 39).  Contrary to plaintiffs' characterizations, no evidence has been presented that defendants "utilized U.S. instrumentalities, assets, and laws to perpetuate their fraud and concealment," by use of American property, land laws, corporations, phones, wire transfers, faxes, and travel.  (Pl. Mem. in Opp. at 10-11, 27-28, 29-30; Pl. Surreply at 11-12.)  In contrast, Germany clearly has the greater interest in these claims, which concern land transfers dating back to the mid-nineteenth century.  (See Müller-Langguth Decl. ¶¶ 5.E—5.F.)[26]

---

[25] Under plaintiffs' theory, whenever there is the possibility of a large verdict with potential tax implications, state and national interests are at stake, a position which the Court finds untenable.

[26] Plaintiffs are correct that defendants did not submit any evidence comparing the dockets in this district, which is currently one of the most congested in the country, with that of the various German courts.  (Pl. Mem. in Opp. at 75-76.)

There is no doubt that Germany is an available and adequate alternative forum, in that defendants clearly are subject to service of process in Germany and Germany permits litigation of the subject matter in dispute.[27]  A good indication of the availability and adequacy of the German judicial system is the fact that these plaintiffs have commenced multiple court proceedings, resulting in fifteen written decisions to date, which deal with these very issues, all of which have concluded in favor of defendants.  (See Def. Mem. in Supp. at 15-25; Pl. Mem. in Opp. at 16-20, 51-55, Ex. B pts. II.1-5, III.1-3, IV-VI, Ex. C ¶¶ 5-10; Def. Reply at 6-15, 28-34; Supp. Müller-Langguth Decl. ¶¶ 8-33, Exs. A-E; Morin Aff. ¶¶ 23-44, Exs. C-D; Pl. Surreply at 4-9, 12-16. Ex. B ¶¶ 6-15.)  These proceedings pertain to the land transfers in 1946-47 and again in 1961-62, the issuance of the "Fideikommiss Dissolution Certificate" issued by the "Family Trust Panel" of the Court of Appeals in Düsseldorf in 1952, a request for an accounting from defendant "Gräflich von Spee'sche

_____

However, that is only one of several factors to be considered. In addition, defendants accurately predict that based upon the progress of this case thus far — or more appropriately, the lack of progress — this one file "would unduly eat up the Court's time and resources in a myriad ways."  (Def. Reply at 45 n.28, 46-47.) As the thirty-page computerized docket sheet reflects, nothing has progressed smoothly in this litigation.

[27] As pointed out by defense counsel to plaintiff's counsel, there have been multiple published decisions within the Second Circuit that have reached that same conclusion.  (See Def. Reply, Ex. A and attachments; see also Def. Mem. in Supp. at 24-25; Def. Reply at 27.)

Zentralverwalthung," and a challenge to the distribution under the will of August, Felicia and Maximilian's father. (See Müller-Langguth Decl. ¶¶ 5.G, 36-61, Exs. A-K; Supp. Müller-Langguth Decl. Exs. A-D; see also Müller-Langguth Decl. ¶¶ 62-78, Ex. L.) These fifteen written decisions generally are lengthy and comprehensive, containing detailed recitations of the same underlying facts and German law at issue in this litigation (Müller-Langguth Decl. Exs. A-K; Supp. Müller-Langguth Decl. Exs. A-D), the significance of which cannot be minimized, notwithstanding plaintiffs' characterizations of "no actual adversarial litigation" and lacking "substantive rulings on the merits." (Pl. Mem. in Opp. at 16; see also Pl. Surreply at 4-9.)[28]

Plaintiffs contend that Germany is not an adequate forum because it does not permit the extensive pretrial discovery allowed in the United States,[29] German courts require litigants to "prepay" court fees, and Germany does not permit contingency fees as does the United States. (Pl. Mem. in Opp. at 4, 38-39, 48-50, 72-75, Ex. B pts. IV-V, Ex. C ¶¶ 8-10; Pl. Surreply at 33-34, Ex. B ¶ 13; see Def. Mem. in Supp. at 15-25; Def. Reply. at 42-44; Supp. Müller-Langguth Decl. ¶¶ 24-25, 28-31, Ex. F.) Germany apparently does allow some degree of discovery, albeit

---

[28] See supra note 22.

[29] But see supra note 5.

undoubtedly not as broad as that authorized in the U.S. (See
Müller-Langguth Decl. ¶ 83.)  Felicia has twice sought financial
aid to commence litigation with a draft complaint, but was unable
to meet the low threshold on the merits.  (Id. ¶¶ 50-60, 80, Exs.
F-J; Supp. Müller-Langguth Decl. Ex. D).[30]  In addition, as
observed by defendants, despite plaintiff Felicia being described
as a "pauper," plaintiffs Constantin and Vladimir have not
submitted any financial affidavits or evidence of their financial
difficulties, other than their support of their mother Felicia
and the "difficul[ty]" they would have maintaining litigation in
Germany, despite having retained five separate law firms, in
Germany and the United States, to represent them in these various
lawsuits.  (Def. Mem. in Supp. at 22-24; Def. Reply, Ex. E ¶¶ 8-
10, 12-16, Ex. F ¶¶ 8-13.)  Moreover, defendants have agreed to
waive any bond requirements set by the courts in Germany.  (Def.
Reply at 43 n.27, 44; Morin Aff. ¶ 43.)  Lastly, although Germany
at one time did not permit contingency fee arrangements, it does
allow for fee-shifting, with the losing party paying the
prevailing party's costs (including attorney's fees), so that if
plaintiffs were to prevail in Germany, they might be entitled to
an award of fees from defendants.  (Def. Mem. in Supp. at 23;

---

[30] As such, this German procedure appears somewhat analogous
to our own 28 U.S.C. § 1915(e)(2)(B)(i) and (ii), under which an
action commenced in forma pauperis is dismissed upon a judicial
determination that the action "is frivolous or malicious," or
"fails to state a claim on which relief may be granted."

Müller-Langguth Decl. ¶ 79; Supp. Müller-Langguth Decl. ¶ 31.f; Morin Aff. ¶ 43, Ex. D.)

Given all these factors, under the "sliding scale" approach established by the Second Circuit in <u>Iragorri</u>, plaintiffs' claims here fall closer to the end of the spectrum where it appears "more . . . that the plaintiff[s'] choice of a U.S. forum was motivated by forum-shopping reason–such as attempts to win a tactical advantage resulting from local laws that favor the plaintiff[s'] case, the habitual generosity of juries in the United States or in the forum district, . . . or the inconvenience and expense to the defendant[s] resulting from litigation in that forum," so that "the less deference the plaintiff[s'] choice commands and, consequently, the easier it becomes for the defendant[s] to succeed on a <u>forum non conveniens</u> motion by showing that convenience would be better served by litigating in another country's courts," than to the opposite end of the spectrum, where it appears "more . . . that a . . . plaintiff[s'] choice of forum has been dictated by reasons that the law recognizes as valid," so that "greater . . . deference . . . will be given to the plaintiff[s'] forum choice."  274 F.3d at 71-72.  (<u>See</u> Def. Mem. in Supp. at 31-33; Pl. Mem. in Opp. at 33-35; Def. Reply at 21-27; Pl. Surreply at 11.)

Plaintiffs' heavily reliance on <u>In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.</u>, 228 F. Supp. 2d 348 (S.D.N.Y.

2002), <u>recon. denied</u>, Nos. MDL 1374, M21-89 (MBM), 2003 WL 145545 (S.D.N.Y. Jan. 21,2003), is completely misplaced.  Plaintiffs posit, <u>inter alia</u>, that <u>In re Assicurazioni</u> supports the position that "it is well established that the U.S. Courts are capable of, and should apply and interpret, German law, when necessary to offer relief to U.S. citizens in a U.S. forum," and that there is no reason to doubt the bona fides of the plaintiffs' choice of U.S. forum when "every . . . named plaintiff is a U.S. resident, and litigation abroad would likely raise costs and necessitate the retention of foreign counsel."  (Pl. Mem. in Opp. at 70 n.40, 72; <u>see also</u> <u>id.</u> at 4, 30-32.)

<u>In re Assicurazioni</u> involved multi-district litigation against several European insurance companies that had issued policies in a dozen countries from 1920 to 1945, which later refused to pay benefits to policy beneficiaries or their surviving family members following the death of policyholders or destruction of property during the Holocaust.  228 F. Supp. 2d at 349-50.  The defendants sought to dismiss plaintiffs' claims on grounds of <u>forum non conveniens</u> in favor of the International Commission on Holocaust Era Insurance Claims ("ICHEIC"), a "private nongovernmental forum that [defendants] both created and control," or in favor of several more convenient European fora. <u>Id.</u> at 353-59.  The court held that the doctrine of <u>forum non conveniens</u> is "appropriately used as a tool to litigate in a more

convenient public forum," and not "an ad-hoc private international claims tribunal" like the ICHEIC, id. at 356. ICHEIC's continued viability was questionable as it had made offers for payment of claims a mere 0.35% of the time, id. at 357-58, and the balance of conveniences under the public and private interest factors weighed against the dismissal of the litigation in favor of the judicial system of one of the seven different European countries involved, id. at 359-66.

A further notable distinction is that the In re Assicurazioni court found that being forced to litigate in Europe would be the "death knell" for plaintiffs' claims as plaintiffs had no connection to the various relevant European jurisdictions and plaintiffs would have to hire new lawyers in seven separate European countries. Id. at 365-66. In this case, however, plaintiffs have retained competent counsel in Germany and have already litigated in Germany and received fifteen decisions or rulings from German courts. Contrary to plaintiffs' assertions, In re Assicurazioni did not involve an application of German law; the motions to dismiss in that case were brought by an Assicurazioni Generali S.p.A., an Italian company, and Zurich Life Insurance Company and Zurich Versicherungs-Gesellschaft, Swiss companies.[31] Id. at 350.

_____

[31] In the recent Kirch decision, the court dismissed a lawsuit on forum non conveniens grounds because "[t]he vast majority of the non-party witnesses . . . are German"; the German

Lastly, in <u>In re Assicurazioni</u>, the interest in the New York forum was unique in that there was governing state statutory law which "explicitly states that no action concerning Holocaust-era insurance claims arising between 1929 and 1945 shall be dismissed from the New York State courts" on <u>forum non conveniens</u> grounds. <u>Id.</u> at 367-69.  Here, Connecticut has no interest in the subject matter of this pending litigation.

---

courts were an adequate alternative forum, particularly because plaintiffs already had filed "two similar actions" there; and "the German forum is preferable given its greater familiarity with the principles of German conflict of law and <u>res judicata</u> under German law."  2006 WL 3247363, at *4-10; <u>see also</u> <u>supra</u> note 22.  Of significance, the district judge cautioned:

> [T]his District [should] not become a way-station for plaintiffs world-wide, who choose to stop at Foley Square just long enough to obtain a grant of federal discovery with their <u>forum non conveniens</u> dismissal. Permitting the extensive discovery requested would only encourage the filing of suits in a forum known to be inconvenient, under hopes of being guaranteed certain procedural advantages in conjunction with a dismissal order and would serve only to waste valuable judicial resources, and further congest an already crowded docket.

<u>Id.</u> at *10 (internal quotations & citations omitted); <u>see also</u> <u>Blackrock, Inc. v. Schroders PLC</u>, No. 07 Civ. 3183 (PKL), 2007 WL 1573933, at *11-12 (S.D.N.Y. May 30, 2007) (reaching the same conclusion and dismissing action in favor of litigation in German courts).

**B.   International comity**

International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience."  Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc., 466 F.3d 88, 92 (2d Cir. 2006) (quoting Hilton v. Guyot, 159 U.S. 113, 163-64 (1895)).  The boundaries of the doctrine are "amorphous" and "fuzzy," and "even where the doctrine clearly applies[,] it is not an imperative obligation of courts but rather is a discretionary rule of practice, convenience, and expediency." Id. (internal quotations & citations omitted); see Republic of Colombia v. Diageo N. Am. Inc., No. 04-CV-4372(NGG), 2007 WL 1813744, at *38 (E.D.N.Y. Jun. 19, 2007).

The principles of international comity apply when a party seeks the recognition of a foreign judgment, or as in this case, when the party seeks "the recognition of a pending foreign proceeding that has yet to reach a final judgment."  Royal & Sun Alliance, 466 F.3d at 92.  The latter comity issue is commonly referred to as "comity of the courts."  See id. (citations omitted); Klonis v. Nat'l Bank of Greece, S.A., 487 F. Supp. 2d 351, 354 (S.D.N.Y. 2006) (citation omitted).  In such a posture, "parallel proceedings in the same personam claim should ordinarily be allowed to proceed simultaneously, at least until a

32

judgment is reached in one which can be pled as res judicata in the other." Royal & Sun Alliance, 466 F.3d at 92 (internal quotations and citations omitted).  It is in the district court's discretion to abstain in deference to pending litigation in a foreign court, though the task for the district court is to "determine whether exceptional circumstances exist that justify the surrender of that jurisdiction." Id. at 93 (citing Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 25-26 (1983) (additional citations omitted)).  As the Second Circuit has explained:

> The Supreme Court has recognized that a decision to
> abstain from exercising jurisdiction based on the
> existence of parallel litigation does not rest on a
> mechanical checklist, but on a careful balancing of
> important factors . . . as they apply in a given case,
> with the balance heavily weighed in favor of the
> exercise of jurisdiction. . . . No one factor is
> necessarily determinative; a carefully considered
> judgment taking into account both the obligation to
> exercise jurisdiction and the combination of factors
> counseling against that exercise is required.
>
> In the context of parallel proceedings in a foreign
> court, a district court should be guided by the
> principles upon which international comity is based:
> the proper respect for litigation in and the courts of
> a sovereign nation, fairness to litigants, and judicial
> efficiency.

Id. at 94 (multiple citations and internal quotations omitted). Although the following list is not exhaustive and the district court should examine the "totality of the circumstances," the Second Circuit has identified the following factors to determine whether the specific facts before it are sufficiently exceptional

to justify abstention: the similarity of the parties, the similarity of the issues, the order in which the actions were filed, the adequacy of the alternate forum, the potential prejudice to either party, the convenience of the parties, the connection between the litigation and the United States, and the connection between the litigation and the foreign jurisdiction. Id. (citations omitted).

The majority of the factors identified by the Royal & Sun Alliance decision have already been addressed above in the context of forum non conveniens. (See supra pt. I.A.) Furthermore, this Court's decision to abstain from exercising its jurisdiction is bolstered by an application of the three principles upon which international comity is based: the proper respect for litigation in and the courts of a sovereign nation, fairness to the litigants, and judicial efficiency. In light of the fifteen reasoned decisions, reached at multiple levels of the German courts, this Court's decision to exercise its jurisdiction would reflect disrespect for the German court's decisions and rulings. Plaintiffs have been litigating in Germany for at least the past three years and have familiarity with and ties to the country which exceed the burden upon defendants to now litigate issues in Connecticut that they have been litigating in Germany. Judicial efficiency will not be served in litigating issues in Connecticut that do not have any tie or connection to this state.

**C.    Other issues**

In light of these conclusions that this action must be dismissed on <u>forum non conveniens</u> and international comity grounds, there is no need to address the remainder of defendants' arguments.

**IV.  Conclusion**

Accordingly, defendants' Motion to Dismiss [Doc. # 52] is GRANTED, plaintiffs' Motion for Hearing [Doc. # 118] is DENIED AS MOOT, plaintiffs' Motion for Leave to File Surreply Brief [Doc. # 140] is GRANTED, and plaintiffs's Motion for Expedited Consideration [Doc. # 141] is GRANTED.  The Clerk is directed to close the case.


IT IS SO ORDERED.



/s/_____

JANET BOND ARTERTON, U.S.D.J.


**Dated at New Haven, Connecticut, this 27th day of September, 2007.**